UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VROOM INC.; VROOM AUTOMOTIVE, LLC d/b/a VROOM, d/b/a TEXAS DIRECT AUTO; CARSTORY, LLC; and VAST.COM, INC. d/b/a CARSTORY, <br><br> Plaintiffs, <br><br> v. <br><br> SIDEKICK TECHNOLOGY, LLC, <br><br> Defendant. | Case No.: 2:21-cv-06737-WJM-JSA <br><br> **OPINION** |

**WILLIAM J. MARTINI, U.S.D.J.:**

Plaintiffs Vroom, Inc., Vroom Automotive, LLC d/b/a Texas Direct Auto, CarStory, LLC, and Vast.com, Inc. d/b/a CarStory (collectively, "Vroom" or "Plaintiffs") brought this declaratory judgment action against defendant Sidekick Technology, LLC ("Sidekick" or "Defendant") seeking a declaration that they do not infringe certain of Sidekick's patents. Before the Court is Plaintiffs' motion (the "Motion") for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure on the basis that each of Sidekick's relevant patents is directed to ineligible subject matter under 35 U.S.C. § 101. ECF No. 33. For the reasons set forth below, Plaintiffs' Motion is **GRANTED**.

I.  BACKGROUND

   A.  The Patents-in-Suit

Sidekick is the owner of U.S. Patent Nos. 9,141,984 (the "'984 Patent"), 8,744,925 (the "'925 Patent"), 8,650,093 (the "'093 Patent"), 9,123,075 (the "'075 Patent"), 9,147,216 (the "'216 Patent"), 9,460,467 (the "'467 Patent"), 9,665,897 (the "'897 Patent"), 9,626,704 (the "'704 Patent"), 10,140,655 (the "'655 Patent"), 10,223,722 (the "'722 Patent"), 10,223,720 (the "'720 Patent"), and 10,796,362 (the "'362 Patent", and, collectively, the "Patents-in-Suit").[1] Broadly speaking, each of the 12 Patents-in-Suit describe systems, methods, and apparatuses for providing automobile market information

---

[1] Each of the 12 Patents-In-Suit was attached as an exhibit to Plaintiffs' Complaint, ECF No. 1. *See* '984 Patent, Compl., Ex. 5; '925 Patent, Compl., Ex. 6; '093 Patent, Compl. Ex. 7; '075 Patent, Compl., Ex. 8; '216 Patent, Compl., Ex. 9; '467 Patent, Compl., Ex. 10; '897 Patent, Compl., Ex. 11; '704 Patent, Compl., Ex. 12; '655 Patent, Compl., Ex. 13; '722 Patent, Compl., Ex. 14; '720 Patent, Compl., Ex. 15; '362 Patent, Compl., Ex. 16. All citations to any of the 12 Patents-in-Suit in this Opinion will be cited simply to the Patents themselves.

and performing or facilitating automobile transactions. *See, e.g.*, '984 Patent 1:55-57; '925 Patent 1:54-56; '093 Patent 1:66-2:1. The Patents-in-Suit are related, share a specification, and can be categorized across three distinct "lineages" that can be identified by the earliest filed patent in each such lineage: (1) the '984 Patent lineage, titled "Automobile Transaction Facilitation Using a Manufacturer Response," includes two continuations – the '897 Patent and the '720 Patent; (2) the '925 Patent lineage, titled "Automobile Transaction Facilitation Based on Customer Selection of a Specific Automobile," includes three continuations – the '216 Patent, the '704 Patent, and the '722 Patent; and (3) the '093 Patent lineage, which is itself a continuation-in-part of both the '925 and '984 Patents, is titled "Used Automobile Transaction Facilitation for a Specific Used Automobile" and includes four continuations – the '075 Patent, the '467 Patent, the '655 Patent, and the '362 Patent.

The Patents-in-Suit broadly describe flaws and inefficiencies in typical automobile transactions caused, chiefly, by a lack of available information and market data by each of the participants involved. Specifically, the Patents-in-Suit state that automobile transactions are routinely plagued by uncertainty, imperfect information, and mistrust that interferes with the ability to efficiently complete such transactions. *See* '984 Patent 1:23-34. For consumers, this may result from a lack of knowledge about specific automobiles, the relevant market, and what may be considered a fair price for a given automobile. *See id.* at 1:35-38. Dealers or sellers, in turn, may lack information about a consumer's capacity or willingness to pay a price for a given automobile in a way that would maximize their profits. *See id.* at 1:38-44. Similarly, manufacturers may lack sufficient market data which would be useful in optimizing production, delivery, and pricing of their automobile inventory. *See id.* at 1:44-51.

The Patents-in-Suit purport to solve these inefficiencies by creating a platform through which consumers, dealers, and manufacturers can input, access, or filter through a range of available automobile market data and use that data to complete automobile transactions. *See id.* at 1:57-62. For example, the Patents-in-Suit explain that automobile manufacturers and dealers may input data related to current offers, automobile specifications and availability, and suggested retail prices in order to generate reports or offers to consumers. *See id.* at 7:34-40, 15:64-16:12. That market data is then stored and used to generate search results or recommendations for consumers who request information about certain kinds of automobiles based on a wide array of qualifications or specifications, including, for example, geographic location, pricing, and inventory data. *See id.* at 5:41-6:4. This system is designed to efficiently match consumers with dealers, manufacturers, or other consumer automobile sellers in order to facilitate automobile transactions.

### B. Procedural History

On March 25, 2021, Plaintiffs commenced this action by filing their 12 count Complaint against Defendant seeking a declaratory judgment that they are not infringing on any of the 12 Patents-in-Suit. ECF No. 1. On August 9, 2021, Defendant filed its Answer to the Complaint and asserted 12 counterclaims for patent infringement covering each of the Patents-in-Suit. ECF No. 15. On September 27, 2021, Plaintiffs answered Defendant's

counterclaims and asserted several affirmative defenses thereto, including that the Patents-in-Suit were each directed to ineligible subject matter under 25 U.S.C. § 101. ECF No. 26. Following the close of the pleadings, Plaintiffs filed the instant Motion seeking a determination on whether the Patents-in-Suit are directed to eligible subject matter within the meaning of § 101.

## II. LEGAL STANDARD

Rule 12(c) of the Federal Rules of Civil Procedure provides that a party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c). Motions made under Rule 12(c) are analyzed under the same standard as those made under Rule 12(b)(6). *Trendx Enters., Inc. v. All-Luminum Prods., Inc.*, 856 F. Supp. 2d 661, 664 (D.N.J. 2012). That is, a Rule 12(c) motion will be granted where the movant "establishes that there are no material issues of fact, and he is entitled to judgment as a matter of law." *Zimmerman v. Corbett*, 873 F.3d 414, 417 (3d Cir. 2017) (quotations omitted). "In considering a motion for judgment on the pleadings, a court must accept all of the allegations in the pleadings of the party against whom the motion is addressed as true and draw all reasonable inferences in favor of the non-moving party." *Id.* at 417-18. The Court need not accept as true "legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Trendx*, 856 F. Supp. 2d at 664. In ruling on a 12(c) motion, the Court is ordinarily limited to the facts as alleged in the nonmoving party's pleadings, the exhibits attached thereto, and matters of public record. *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1996 (3d Cir. 1993). The Court may, however, look outside the pleadings and also consider "document[s] integral to or explicitly relied upon in the [pleadings]" or any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *In re Asbestos Prod. Liability Litig. (No. VI)*, 822 F.3d 125, 134 n.7 (3d Cir. 2016).

"Patent eligibility under § 101 is a question of law that may contain underlying questions of fact." *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1095 (Fed. Cir. 2021). As such, "[p]atent eligibility can be determined on the pleadings under Rule 12(c) when there are no factual allegations that, when taken as true, prevent resolving the eligibility question as a matter of law." *Data Engine Techs. LLC v. Google, LLC*, 906 F.3d 999, 1007 (Fed. Cir. 2018).

## III. DISCUSSION

### A. Representative Claims

The threshold issue in this case which the Court must address before determining whether the Patents-in-Suit are directed to eligible subject matter is which claim or claims are representative of the four-hundred and five (405) claims included across the twelve Patents-in-Suit. Plaintiffs assert that claim 1 of the '362 Patent is representative of all claims. Defendant, however, disagrees and suggests that representative claims are needed as to each of the three separate patent lineages which comprise the Patents-in-Suit, with

claim 1 of the '925 Patent representing the '925 Patent lineage, claim 1 of the '984 Patent representing the '984 Patent lineage, and claim 1 of the '075 Patent representing the '093 Patent lineage.[2]

It is well established that, in determining questions of patent eligibility or invalidity, the Court may treat some claims as representative rather than address each claim individually where the claims are "substantially similar and linked to the same abstract idea." *Content Extraction and Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). This includes the treatment of a single claim as representative of all claims across multiple patents. *See e.g.*, *Elec. Power Grp., LLC v. Alstrom S.A.*, 830 F.3d 1350, 1351 (Fed. Cir. 2016) (treating one claim as representative of sixteen asserted claims across three patents). Indeed, it is also clear that the Court may treat claims as representative even where the parties do not agree or stipulate to such treatment. *See, e.g.*, *Context Extraction*, 776 F.3d at 1348 (treating two claims from two patents as representative of 242 claims at issue across four patents over patentee's objection on appeal).

Less established, however, is the appropriate framework for resolving disputes over which claims are in fact representative. More specifically, it is not clear which party bears the burden of establishing, or contesting, the representativeness of a certain claim or claims, and courts have articulated different approaches and considerations in making this determination. *Compare Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) (noting that courts may treat claims as representative where "the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim") *with Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 n.6 (Fed. Cir. 2016) (treating asserted claims together rather than individually despite no arguments, agreements, or findings as to representative claims because "there [was] no contention that the claims differ[ed] in any manner that [was] material to the patent-eligibility inquiry) *and with PPS Data, LLC v. Jack Henry & Assoc's, Inc.*, 404 F. Supp. 3d 1021, 1031-32 (E.D. Tex. 2019) (applying burden shifting framework in which party asserting representativeness must offer a substantial rationale for treating claim as representative, and, if able to do so, the party opposing representative claim designation must then "identify limitations that are presented in the asserted claims but that are not represented by the allegedly representative claim").

The Court is not convinced that either party has offered a particularly compelling argument in support of their respective proposed representative claims. On the one hand,

---

[2] Elsewhere in its brief, Defendant appears to argue that independent analysis of eligibility under § 101 with respect to all four-hundred and five claims is necessary. The Court disagrees. Defendant specifically asserts claim 1 of the '925 Patent, claim 1 of the '984 Patent, and claim 1 of the '075 Patent as representative claims. Having done so, Defendant cannot also ask that, should the Court find these claims ineligible under § 101, the remaining four-hundred and two claims each be analyzed individually. *See Maxell, Ltd. v. Fandango Media, LLC*, No. CV 17-07534 AG (SSX), 2018 WL 4502492, at *4 (C.D. Cal. Sept. 11, 2018).

aside from it being the most recently filed of the Patents-in-Suit, and thus the Patent-in-Suit with the longest lineage, Plaintiffs have not explained why claim 1 of the '362 Patent is an adequate representative of the remaining four hundred and four claims. On the other hand, however, Defendant has not offered any explanation why the three claims it offers as representative of the three lineages are either any more representative of the body of claims at issue than claim 1 of the '362 Patent or are sufficiently distinct from each other in any way that might alter the eligibility analysis so as to necessitate three separate representative claims. Indeed, it is worth noting that Defendant does not even analyze its proposed representative claims separately in arguing in favor of eligibility, and instead more generally references aspects of the Patents-in-Suit with citations to one or two of its proposed representative claims.

Having reviewed the Patents-in-Suit, their claims and claim elements, and the specifications, the Court will treat claim 1 of the '984 Patent as representative. Claim 1 of the '984 Patent recites:

1. A method comprising:

    storing, on a computer readable medium, automobile market data which is representative of recent automobile market characteristics, including at least pricing data and inventory data, wherein the automobile market data includes information received from at least one manufacturer, a plurality of dealers, and a plurality of consumers, wherein at least a portion of the automobile market data is updated in real-time;

    receiving, via a consumer interface, a first request for a response regarding a first automobile, which is manufactured by a first manufacturer, the first request made by a consumer located at a first location and including geolocation information of the consumer;

    executing instructions, by at least one processing device, to:

    determine current inventory data of the first automobile, wherein the current inventory data of the first automobile includes a plurality of dealer inventories of a plurality of dealers, with each respective dealer of the plurality of dealers having a respective dealer inventory, and wherein the current inventory data indicates that a first dealer of the plurality of dealers does not currently have the first automobile in a first inventory of the first dealer;

    provide first automobile market data including the current inventory data of the first automobile to the first manufacturer, based on the first request, via a manufacturer interface, wherein the first automobile market data is based on real-time automobile market data;

> generate, based on the first automobile market data including the current inventory data of the first automobile, via the manufacturer interface, at least one of a verification indicating that the first automobile can be provided for the consumer, a confirmation indicating that the first automobile can be provided for the consumer, and an offer indicating that the first automobile can be provided for the consumer;
>
> determine, using the geolocation information, that the consumer is located at the first location;
>
> generate, based on the first location, an in-market dealer area proximately located to the first location;
>
> determine that the first dealer is located at a second location within the in-market dealer area;
>
> provide a first manufacturer response via the consumer interface, the first manufacturer response including the at least one of the verification indicating that the first automobile can be provided for the consumer, the confirmation indicating that the first automobile can be provided for the consumer, and the offer indicating that the first automobile can be provided for the consumer;
>
> request, from the first dealer, via a dealer interface, an inventory less bid to sell the first automobile based on the first manufacturer response;
>
> receive, from the first dealer located at the second location and engaging in inventoryless bidding, the inventoryless bid to provide the first automobile, which is at least one of yet to be manufactured and in the inventory of another entity;
>
> generate driving directions from the first location to the second location; and provide the inventoryless bid and the driving directions to the consumer interface, the inventoryless bid including at least a price and a delivery option; and
>
> receiving a consumer selection of the inventoryless bid including a first delivery option which specifies a pickup location at the first dealer, wherein the consumer selection indicates a consumer intention to purchase the first automobile.

The reasons for treating claim 1 of the '984 Patent as representative are straightforward. Unlike claim 1 of the '362 Patent proposed by Plaintiffs, claim 1 of the '984 Patent includes the additional element of storing automobile market data. Moreover, with minor exceptions that no party has suggested bears on the eligibility analysis,[3] claim

---

[3] For example, claim 1 of the '984 Patent recites a process in which the automobile manufacturer is involved in receiving and responding to a consumer request for a response pertaining to a specific automobile made by that manufacturer. Neither claim 1 of the '925 Patent nor claim 1 of

1 of the '984 Patent includes the major elements and limitations argued by the parties for and against eligibility, including, for example, the use of geolocation data and driving directions. Because claim 1 of the '925 Patent and claim 1 of the '075 Patent are themselves substantially similar and, as explained below, are all linked to the same abstract idea as claim 1 of the '984 Patent, the Court sees no reason to analyze those claims, or the claims of any of the other Patents-in-Suit, separately.

### B.     Patent Ineligibility

Section 101 of the Patent Act provides that anyone who "invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." 35 U.S.C. § 101. Notwithstanding the breadth of § 101, the Supreme Court has long recognized that the provision "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. V. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quotations omitted). In *Alice*, the Supreme Court set forth a two-step test used to determine whether a patent claim is directed to ineligible subject matter under § 101. *Id.* at 217. At step one, the Court considers "whether the claims at issue are directed to a patent-ineligible concept." *Id.* at 218. If so, the Court proceeds to step two, in which it must "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstracted idea into a patent-eligible application." *Id.* at 222.

#### 1.     *Alice* Step One

In deciding whether a patent claim is "directed to" ineligible subject matter at step one, the Court looks primarily to "what the patent asserts to be the 'focus of the claimed advance over the prior art.'" *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019) (quoting *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016)). In so doing, the Court focuses on the language of the claims themselves considered in light of the specification. *See TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292-93 (Fed. Cir. 2020) (quotations omitted). The critical inquiry is whether the claims "focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016). In the context of computer software innovations, the inquiry "often turns on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies [as] an abstract idea for which computers are

---

the '075 Patent directly requires manufacturer participation in this manner. Similarly, unlike either claim 1 of the '984 Patent or claim 1 of the '925 Patent, the '075 Patent is specifically focused on used automobile transactions from the perspective of a consumer seller. Neither of these differences is material to the eligibility analysis. Rather, they simply relate to the parties involved in a given process or transaction or narrow the focus to a specific kind of automobile transaction (i.e., new vs. used).

invoked merely as tools." *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1306-07 (Fed. Cir. 2020).

Although the Supreme Court has not defined the "precise contours of the 'abstract ideas' category," courts have identified certain categories of claims that are generally found to be directed towards abstract ideas. *See Content Extraction*, 776 F.3d at 1347. For example, claims focused on "collecting information, analyzing it, and displaying certain results of the collection and analysis are directed to an abstract idea" and thus ineligible for patent protection. *SAP Am., Inc. v. Investpic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018). Claims focused on longstanding and fundamental economic practices are likewise directed to ineligible subject matter within the meaning of § 101. *Alice*, 561 U.S. at 611.

Here, claim 1 of the '984 Patent is directed towards the abstract idea of collecting and using automobile market and user data to facilitate automobile transactions. With respect to the use of automobile market data, claim 1 of the '984 Patent recites no more than the sort of collection and storage of information that courts have routinely found abstract at *Alice* step one. *See, e.g.*, *Content Extraction*, 776 F.3d at 1347 (finding claims for method of extracting data from hard copy documents, recognizing and categorizing such data, and storing data in computer memory "drawn to basic concept of data recognition and storage"); *Elec. Power Grp.*, 830 F.3d at 1353-54 (finding claims for method of collecting, analyzing, and displaying electric power grid data directed to abstract idea); *Move, Inc. v. Real Estate Alliance Ltd.*, 721 F. App'x 950, 954-55 (Fed. Cir. 2018) (finding claims for method of searching for available real estate properties within given geographical area directed to abstract idea of "collecting and organizing information about available real estate properties and displaying this information on a digital map that can be manipulated by the user"); *Audatex N. Am., Inc. v. Mitchell Int'l, Inc.*, 703 F. App'x 986, 989-90 (Fed. Cir. 2017) (finding claims for method of generating vehicle valuation reports direct to abstract idea of "providing a vehicle valuation through the collection and use of vehicle information").

The remaining elements of claim 1 of the '984 Patent do no more than recite a computerized method of performing the basic steps in an automobile transaction. Specifically, claim 1 recites a process in which (1) a consumer requests information about a specific automobile, which includes the consumer's geolocation information; (2) an automobile manufacturer reviews real-time market data for the requested automobile, including inventory data from a plurality of dealers to determine whether the automobile can be provided to the consumer; (3) based on the manufacturer's response to the consumer's request, a dealer in an area proximately located to the consumer submits an inventoryless bid to sell the requested automobile; and (4) the consumer receives the bid, which includes at least price and delivery options, as well as driving directions to the dealer making the bid, and then selects a bid indicating an intent to purchase the automobile. *See* '984 Patent 19:15-20:9. These claim elements fall well within the category of claims found to be directed to patent-ineligible economic concepts and business practices. *See, e.g.*, *Mortg. Grader*, 811 F.3d at 1324 (claim directed at abstract idea of "anonymous loan shopping" where claim merely recited steps of completing loan transaction); *cxLoyalty,*

*Inc. v. Maritz Holdings Inc.*, 986 F.3d 1367, 1376 (Fed. Cir. 2021) (claim for method of using consumer loyalty or reward points to make purchases directly from third-party vendors directed to abstract idea of "facilitating, or brokering, a commercial transaction"); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015) (claim directed at abstract idea of "offer-based price optimization" where claim recited a method of pricing a product for sale); *Source Search Techs., LLC v. Kayak Software Corp.*, 111 F. Supp. 3d 603, 608 (D.N.J. 2015) (finding that concept of "obtaining quotes for goods or services from selected vendors" fell squarely within abstract category of fundamental economic practices).

In short, claim 1 of the '984 Patent merely combines abstract concepts and processes to describe the longstanding and fundamental practice of searching for and using available market information to complete automobile transactions. *See Elec. Power Grp.*, 830 F.3d at 1154; *see also FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1094 (Fed. Cir. 2016) (claims for system and method of detecting fraud or misuse in use of computers by analyzing user or performance data directed to combination of abstract ideas of "collecting and analyzing information to detect misuse and notifying a user when misuse is detected").

That claim 1 of the '984 Patent provides for the implementation of this ordinary practice on a computer through an online platform does not make its focus any less abstract. *See Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017). First, claim 1 of the '984 Patent does not focus on or describe any specific technological improvement or advance in computer or network functionality. Rather, the claims describe, in purely functional terms, the use of only generic computer components and conventional computer functions as tools to be used to accomplish abstract concepts. *See Affinity Labs*, 838 F.3d at 1258-59 (claims directed to abstract idea where they claimed "the function of wirelessly communicating regional broadcast content to an out-of-region recipient, not a particular way of performing that function"). For example, the first element of claim 1 of the '984 Patent recites the basic function of storing automobile market data in a format that can be accessed through a computer, without any mention of any new or improved process for collecting, analyzing, organizing, presenting, or storing that data. *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1288 (Fed. Cir. 2018) (noting that "an improvement to the information stored by database is not equivalent to an improvement in the database's functionality"). Similarly, the remaining claim elements recite (1) various user interfaces through which users navigate the platform to request information about automobiles or respond to such requests using the stored market data, and (2) the use of a processing device to enable these interactions. However, the claim elements neither describe any specific improvements in the creation or functionality of any such user interfaces or processing devices nor provide a technical explanation of how these elements are to be implemented on a computer. *See Move*, 721 F. App'x at 955-56 (claim directed to abstract idea where it "broadly recite[d] the commercial practice of 'using a computer for locating available real estate properties'" without any "technical details or explanation of how to implement the claimed abstract idea using the computer"); *cf. Data Engine Techs.*, 906 F.3d at 1010-11 (distinguishing claims "simply directed to displaying a

9

graphical user interface or collecting, manipulating, or organizing information" from those reciting a "specific improvement to the way computers . . . operate" (alterations in original) (quotations omitted)).[4]

Second, each of the elements of claim 1 of the '984 Patent recite a process that humans have long been able to do on their own without the use of a computer. *See Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016). For example, as the specification itself acknowledges, there is no question that parties to a prospective automobile transaction searched for and took into account automobile market data, including price, availability, and other qualities such as mileage or safety features, before completing a transaction. *See Context Extraction*, 776 F.3d at 1347 (noting that humans have always performed functions of data collection, recognition, and storage); *see also* '984 Patent 1:35-51 (noting development of products used to assist parties to automobile transaction in tracking market prices). Similarly, notwithstanding Defendant's contention to the contrary, it is obvious that the use of "geolocation data" has always been implicitly taken into account by parties to a transaction, whether it be by consumers who only visit stores in their local area or by businesses which advertise locally. *See British Telecommunications PLC v. IAC/InteraActive Corp.*, 813 F. App'x 584, 587 (Fed. Cir. 2020) (tailoring information or content based on the characteristics of a user, including location data, is itself an abstract idea); *see also Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369 (noting that information tailoring based on consumer characteristics is a fundamental practice). And, of course, humans have long been able to complete the steps inherent in automobile transactions described by the Patents-in-Suit – inquiring about a specific automobile, negotiating prices or weighing competing offers, and selecting an offer and physically going to a car dealership to pick up the purchased automobile – without a computer. *See Mortg. Grader*, 811 F.3d at 1324.

The specification confirms that claim 1 of the '984 Patent is directed to an abstract idea rather than any patentable improvement in technology. At the outset, the specification makes clear that the problem the Patents-in-Suit are designed to address is not one in either data collection or storage, user interface construction, computer processing ability, or network functionality which has, until now, prevented efficient automobile transactions. Rather, the specification identifies the problem as one of imperfect information: consumers

---

[4] For this same reason, Sidekick's reliance on Judge Martinotti's decision in *Nasdaq, Inc. v. IEX Grp., Inc.*, Civil Action No. 18-3014-BRM-DEA, 2019 WL 102408 (D.N.J. Jan. 4, 2019), is misplaced. That case, which Judge Martinotti acknowledged was a "close question of eligibility," involved claims directed to solving "bottleneck and other latency issues associated with transmission of large data sets" in the context of electronic securities trading. *Id.* at *6. Judge Martinotti found the claims at issue in *Nasdaq* were "directed as resolving an existing technological problem" that was specific to computer network functionality and were thus patent-eligible. *Id.* at *6-7. By contrast, there is nothing in the record of this case which indicates that representative claim 1 of the '984 Patent is directed towards the resolution of any such specific technological problem.

and dealers in the physical world lack the full body of relevant, real-time data needed to make optimally efficient transactions. *See* '984 Patent 1:17-51.

Moreover, in describing how to implement the claimed improvement, the specification, like the claim itself, describes the new systems and methods in "purely functional terms" using generic computer components. *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016). Indeed, the specification makes clear that the systems and methods claimed in the '984 Patent "can be implemented using one or more computer programs or components" which "may be provided as a series of computer instructions on any conventional computer-readable medium, including RAM, ROM, flash memory, magnetic or optical disks, optical memory, or other storage media" that are "configured to be executed by a processor." '984 Patent 18:40-46. Further, the specification describes the various computer components needed to carry out the basic steps of the claimed systems and methods in broad, general terms. *See, e.g.*, *id.* at 2:64-3:4 (noting that system may include variety of client devices with displays, including desktop computers, mobile phones, or tablet computers), 3:5-9 (stating that client and host devices may communicate over any suitable wide area network or local area network), 3:50-53 (describing processor as "any suitable processor"), 3:63-65 (stating that interface circuit "may be implemented using any suitable interface standard, such as an Ethernet interface and/or a Universal Serial Bus interface"), 3:65-4:7 (noting variety of input devices that may be used to input data or commands, including a keyboard, mouse, touch screen, or voice recognition system, and output devices that may be used to receive information, such as displays, printers, speakers, or other output devices), 4:20-23 (stating that "one or more storage devices may be connected to the main unit via the interface circuit" including "a hard drive, CD drive, DVD drive, and/or other storage devices"), 4:30-45 (noting that network devices may include multiple servers which may include "any kind of data" and may "store and operate various applications relating to receiving, transmitting, processing, and storing" data, and that "various configurations of one or more servers may be used to support and maintain the system"), 4:63-65 (stating that "various options for managing data located within the computing device and/or in a server may be implemented"). These general descriptions of conventional computer and network components make clear that the components themselves are merely "conduits for the abstract idea" of collecting and using automobile market and user data to facilitate automobile transactions. *See In re TLI Commc'ns Patent Litig.*, 823 F.3d at 612-13.

Defendant makes a number of arguments against finding the claims of the Patents-in-Suit directed to an abstract idea, none of which is persuasive. First, the recited claim elements belie Defendant's contention that the performance of automobile transactions is simply the result of the non-abstract claimed steps and processes described in the Patents-in-Suit rather than their focus. As the Court has already noted, the claimed steps and processes are no more than the computerized method of performing the basic and essential steps of an automobile transaction. The abstract concept of automobile transactions does not become any less abstract simply because the Patents-in-Suit use generic technology to conduct such transactions over an online platform rather than in person. *See Capital One*,

11

792 F.3d at 1370 ("Steps that do nothing more than spell out what it means to 'apply it on a computer' cannot confer patent-eligibility"); *FairWarning*, 839 F.3d at 1094 ("FairWarning's claims merely implement an old practice in a new environment.").

Further, the Court is not persuaded by Defendant's argument that the Patents-in-Suit improve existing technology for at least two reasons. For one, in support of this contention, Defendant cites only conclusory statements in the specification that the Patents-in-Suit set forth a "new and innovative" method for providing automobile market information and facilitating automobile transactions, and that the "integration of various types of automobile market data . . . may provide a synergistic and optimal resource" for users rather than any specific technological improvements. Indeed, these statements support the Court's conclusion that the claimed improvement is in the abstract idea itself through the use of generic technology rather than any improvement in the function of technology as such. *See Customedia Techs.*, 951 F.3d at 1363. Claim 1 of the '984 Patent may recite improvements in how automobile transactions are performed, but nothing in the claim suggests that it is an improvement in the technology used to perform those transactions itself. *Move*, 721 F. App'x at 956. Beyond that, however, even if the Court were to accept Defendant's assertions, they describe only the sort of data synthesis and improved efficiency that courts have regularly found insufficient to render a claim nonabstract. *See FairWarning*, 839 F.3d at 1097 ("The mere combination of data sources, however, does not make the claims patent eligible."); *Capital One*, 792 F.3d at 1370 ("[M]erely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea.").

Finally, Defendant argues that the claim limitations in claim 1 of the '984 Patent for, among other things, the use of real-time market data, geolocation information, optical character recognition, driving directions from consumers to dealers, or the precise nature of the interactions between various users ensure that the Patents-in-Suit do not preempt the entire field of performing automobile transactions and thus ought to be patent-eligible. "A narrow claim directed to an abstract idea, however, is not necessarily patent-eligible, for '[w]hile preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility.'" *Symantec*, 838 F.3d at 1320-21 (quoting *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015)); *OIP Techs.*, 788 F.3d at 1362-63 ("And that the claims do not preempt all price optimization or may be limited to price optimization in the e-commerce setting do not make them any less abstract."). The question, rather, becomes whether those additional features and limitations add the necessary "inventive concept" at step two of the *Alice* framework to take an otherwise abstract concept and place it in the realm of patent-eligible subject matter.

The Court concludes that the Patents-in-Suit are directed to an abstract idea. As such, the Court must proceed to step two of the *Alice* framework.

### 2. *Alice* Step Two

At step two of the *Alice* framework, the Court must consider whether the claim elements, considered both individually and 'as an ordered combination,' include an "inventive concept" sufficient to transform an abstract idea into a patent-eligible application. *Alice*, 573 U.S. at 217. To confer patent-eligibility, this 'inventive concept' must be "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 217 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72-73 (2012)). "Claim limitations that recite 'conventional, routine and well understood applications in the art' are insufficient to 'supply an inventive concept.'" *BSG Tech*, 899 F.3d at 1289 (quoting *Ariosa Diagnostics*, 788 F.3d at 1378).

The Court finds that the elements of claim 1 of the '984 Patent, considered individually and in combination, fail to recite a sufficiently inventive concept to confer patent eligibility. Sidekick's recitation of the advantages and improvements provided by the patented systems and methods are unpersuasive. While Sidekick may be correct that the claimed systems and methods do indeed confer advantages in the realm of automobile transactions over the prior art, "provid[ing] a distinct advantage over alternatives is not the test for eligibility." *Smartflash LL v. Apple Inc.*, 680 F. App'x 977, 984 (Fed. Cir. 2017). Indeed, the Court "may assume that the techniques claimed are '[g]roundbreaking, innovative, or even brilliant,' but that is not enough for eligibility." *SAP Am.*, 898 F.3d at 1163 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 591 (2013)). Instead, there must be an inventive concept recited in the claims themselves.

On this point, as the Court has already noted, Sidekick relies almost entirely on conclusory statements made in the specification that the claimed systems and methods are "new and innovative" or offer "a synergistic and optimal resource" for users which fail to identify any such inventive concept. Some of the specific claim limitations highlighted by Sidekick are routine, well understood features which, absent some specific improved technological process in implementation that is not claimed or otherwise described in the Patents-in-Suit, do not render the claims patent eligible. *See Move*, 721 F.3d at 957 (finding map zoom feature failed to supply inventive concept where neither claim language nor specification explained how feature or its implementation was inventive or non-generic); *see also, e.g.*, *Content Extraction*, 776 F.3d at 1349 (dependent claims reciting additional steps such as optical character recognition technology were insufficient to render claim patent eligible); *Elec. Power Grp.*, 830 F.3d at 1355 (collection and display of real-time data not inventive concept). Defendant has not pointed to any language in the claims or the specification that suggests any unconventional or nonroutine implementation of these various features. Moreover, other elements, such as the limitation with respect to inventoryless bidding or inclusion of a manufacturer response are simply insignificant additional steps in the automobile transaction process that do not "meaningfully limit" the abstract idea or add to it an inventive concept. *See OIP Techs.*, 788 F.3d at 1364; *Alice*, 573 U.S. at 222.

Because claim 1 of the '984 Patent does not recite any new process, technique, or method in performing any of the claimed features or limitations, the Court turns to consider whether the claim includes an inventive concept in the required computer implementation of its various steps. It does not. As the Court has already noted, it is clear that claim 1 of the '984 Patent recites the use of only generic computer components performing their conventional and routine functions as a means of carrying out the claimed steps. Just as the use of generic computer components and functions is insufficient to alter the "abstract idea" analysis at step one, the use of such generic components and functions is unable to provide the "inventive concept" necessary to transform that abstract idea into a patent-eligible application at step two. *Elec. Power Grp.*, 898 F.3d at 1170; *see also Content Extraction*, 776 F.3d at 1348 (noting that attempt to limit application of abstract idea to particular technological environment does not add requisite inventive concept).

Nor is there any inventive concept in the ordered combination of the elements of claim 1 of the '984 Patent. Rather, the steps are ordered in an entirely conventional way familiar to every automobile purchaser: a consumer seeks information on an automobile or type of automobile with certain features from a manufacturer, the manufacturer confirms whether that automobile is available in the consumer's area, dealers in the consumer's area which sell the desired automobile submit offers to the consumer, and the consumer evaluates the competing offers, accepts the most favorable one, and goes to the dealership to pick up their purchased automobile when it is available. *See Two-Way Media*, 874 F.3d at 1341. These are simply the ordinary steps of many automobile transactions. *Boom! Payments, Inc. v. Stripe, Inc.*, 839 F. App'x 528, 533 (Fed. Cir. 2021) ("[T]he order and timing of the claim elements are merely the necessary steps of executing payment escrow and so do not constitute an inventive concept."). Implementing these steps through the use of a data storage system and a processing device that enables interactions between consumers, dealers, and manufacturers is "no more than the sort of 'perfectly conventional' generic computer components employed in a customary manner" that is insufficient to transform an abstract idea into a patent-eligible invention. *Audatex*, 703 F. App'x at 990.

Sidekick's attempts to argue that the claims require anything other than routine, well-understood, or conventional computer components and functions are unavailing. First, while Sidekick is correct that, on a motion for judgment on the pleadings, the Court must accept its factual allegations as plead in its counterclaims as true, this does not apply to conclusory statements. As such, the Court is not required to accept as true Sidekick's conclusory allegations in its counterclaims, repeated for each of the twelve Patents-in-Suit, that the written description for each such Patent describes "how the non-conventional and non-generic combination of claim limitations is patentably distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention." Counterclaims ¶¶ 51, 65, 79, 93, 107, 121, 134, 147, 160, 170, 186, 199. Simply put, neither the allegations in the counterclaims nor the Patents-in-Suit themselves describe any sort of non-generic or not well-understood computer component, function, or combination thereof in the implementation of the claimed steps.

14

Sidekick also argues that claim construction is required as to the use of the term "processing device" in the claims before the question of eligibility can be determined, and, therefore, resolution of eligibility on a 12(c) motion in the absence of a developed factual record is inappropriate. The Court again disagrees. The claim itself states that the necessary processing device is used to execute instructions that utilize stored market data in enabling interactions between users through various interfaces. *See* '984 Patent 19:20-20:3. In describing the processing device recited in the claim, the specification makes clear that the necessary processor "may be any suitable processor" which may execute a stored software program to interact with other necessary devices "in any suitable manner." '984 Patent 3:50-57. There is nothing in either the claim or the specification that suggests the processing device is anything other than a generic processor used to perform a basic, routine, and well-understood function of conventional computers.

Sidekick argues that, properly construed, the term "processing device" may refer to the "automobile market information processing system" described in the specification. However, Sidekick does not explain how this proposed construction would alter the eligibility analysis. *See Simio*, 983 F.3d at 1365. There is nothing in either the claim or the specification that suggests that the "automobile market information processing system" is a non-generic or unconventional use of technology. *See SAP Am.*, 898 F.3d at 1170 (finding claimed use of parallel processing computing architecture generic where "neither the claim nor the specification call[ed] for any parallel processing architectures different from those available in existing systems"). Indeed, the opposite appears to be true. According to the specification, the system stores automobile market data in a database, provides that data to various users who interact with the system through their respective interfaces, facilitates interactions between users (i.e., processes communications between consumers, manufacturers, and dealers), and then stores and integrates user inputs (such as bids from dealers, completed transaction details, or other prior interactions with the system) to update the automobile market data in real time. These are ordinary data storage and processing functions of a computer unaccompanied by any description or explanation of a specific or unconventional development or implementation thereof. In other words, what Sidekick characterizes as hardware specifically programmed to perform the claimed steps is "purely functional and generic." *Alice*, 573 US at 226.[5]

---

[5] On this point, Sidekick's reliance on the out-of-district case *eBuddy Techs. B.V. v. LinkedIn Corp.*, No. 20-1501-RGA-CJB, 2021 WL 7209517 (D. Del. Nov. 29, 2021), *report and recommendation adopted*, 2022 WL 733996 (D. Del. Mar. 11, 2022) is unpersuasive. There, in denying a motion to dismiss patent infringement claims on the basis of patent-ineligible subject matter, the court relied on specific, detailed, and plausible allegations in the patentee's complaint demonstrating how and why the claimed invention was not conventional. *Id.* at *7-9. Here, by contrast, as the Court has noted, representative claim 1 of the '984 Patent and its specification recite only generic computer components and functions, and Sidekick's counterclaims merely reference, in conclusory fashion, how the written description of each Patent-in-Suit demonstrates the "non-conventional and non-generic combination of claim limitations" provided for therein.

\* \* \*

Accordingly, claim 1 of the '984 Patent is directed to the abstract idea of collecting and using automobile market and user data to facilitate automobile transactions and fails to include any inventive concept that sufficiently transforms that abstract idea into a patent eligible application. Because the remaining claims of the '984 Patent do not meaningfully limit this central abstract idea or otherwise provide an inventive concept with respect thereto, those claims too are similarly patent-ineligible. Finally, as the Court has already noted, the claims of the other Patents-in-Suit include immaterial variations on the central abstract idea that do not add supply any inventive concept and thus do not alter the eligibility analysis. As such, each of the claims of the twelve Patents-in-Suit is directed towards ineligible subject matter under § 101.

## IV.  CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for judgment on the pleadings is **GRANTED**. An appropriate order follows.

/s/ *William J. Martini*
**William J. Martini, U.S.D.J.**

**Date: June 27, 2022**